## Benjamin Roach's Executors *vs.* H. L. Bennett et al.

Judgments cannot operate as liens upon mere equities, yet courts of equity will treat them as liens, and enforce them accordingly, by placing the judgment-creditor in the place of the judgment-debtor.

Where the wife has a separate estate, which she permits her husband to use, and there is no agreement as to interest to be paid by him, the law will presume, in the absence of any circumstance showing a contrary intention, that the husband should not account for interest upon the fund of his wife.

The fund being placed in the hands of the husband, as the agent of the trustee of the wife, to be by him loaned out at interest, or to make the best investment he could for the benefit of his wife ; *held,* that the husband was properly chargeable with the interest at which the money could have been loaned.

The payment of interest by the husband on the funds of his wife to the trustee, is no evidence of fraud.

Roach *v.* Bennett et al.

The complainant can have no relief in this case, unless it be shown that the husband, (B.,) with a view to defraud his creditors, used the funds of the firm of S., F. & Co., or his own individual funds, in the purchase of property for, or in securing a benefit to, his wife.

On appeal from the southern district chancery court at Natchez; Hon. James M. Smiley, vice-chancellor.

This bill of complaint was filed by Roach, as a judgment-creditor of Shipp, Ferriday & Co., exhibiting judgments at law against Bennett, as a surviving partner, and returns of *nulla bona* to executions issued thereon. Alleges that Mrs. Bennett has a separate estate under a marriage contract between her and Bennett, in which Gillespie and others are trustees; but charges that Bennett, " to delay, hinder, and defraud " Roach in the collection of his debt, had withdrawn assets of his own, or of Shipp, Ferriday & Co., which firm was largely insolvent, and had invested the same in his wife's separate estate in Louisiana and Mississippi for the purpose of enlarging it; and seeks a discovery from the defendants of the wife's separate estate, making Bennett, Mrs. Bennett, John F. Gillespie, and the other trustees in the marriage contract, defendants.

Bennett files his separate answer, pleads his discharge in bankruptcy in bar, denies positively and particularly every charge of fraud in the bill, and discovers the situation and extent of Mrs. Bennett's separate estate, detailed in schedules annexed to his answer.

The joint and several answer of John F. Gillespie, the only acting trustee under the marriage contract, and of Mrs. Bennett, state Bennett's discharge in bankruptcy, positively and fully deny the charges of fraud, and discover, in the answer and exhibits accompanying it, how the separate estate has existed from the time of its commencement till the filing of the answer.

In their answer, it is stated in the first instance, that the moneys of the separate estate were loaned to Mr. Bennett by the trustee, Gillespie, but subsequent reflection satisfied him that this statement was an error; and that the separate estate had been put in Bennett's hands as his, the trustee's agent, to invest and make productive. And the answer, as to the trustee, Gillespie, is corrected in this respect by consent of com-

plainants' counsel, but denied as to Bennett and Mrs. Bennett on the same application for leave to correct.

The exhibits to the answer shows what means of the separate estate Bennett received as agent, and used and charged himself therefor with ten per cent. interest, keeping an interest account, as was usual with the house with all persons, as shown by Waters at the close of his deposition.

As shown by these exhibits, and as testified to by John F. Gillespie, whom complainants make a witness of, and examine, a settlement was had between Bennett the agent and Gillespie the trustee, in the early part of 1840, when the agency transactions were closed on an interest account, on both sides, at ten per cent., and Bennett paid off Gillespie, as trustee, what he was owing, (less a balance of upwards of $3,000, which remains unpaid,) in notes of Hopkins and others, Gillespie discounting them for the time they had to run at ten per cent. per annum.

Gillespie states that he expected an account of profits at least equal to ten per cent. per annum; that that was the usual rate of interest on loans, and could be readily commanded on good security. He testifies to the correctness of the transactions and settlement, that it was *bonâ fide*, &c. At the same time, the commercial houses of Bennett were in a failing condition, and ultimately failed badly.

*Montgomery & Boyd*, for appellants, filed a very long written argument.

*J. T. McMurran*, for appellees, filed a lengthy printed argument.

*Per Curiam.* The appellant was a large creditor of the mercantile firms of Shipp, Ferriday & Co., at Natchez, and Bullett, Shipp & Co., at New Orleans, both of which firms consisted of the same persons, Bennett, the appellee, being a member of both. The appellant recovered judgments on his claims, one in December, 1841, and the other in December, 1842; but the firms were insolvent, and nothing could be realized by execution.

Mrs. Bennett had a separate property secured to her by a

marriage contract, most of which came to the hands of her husband, and was probably used by him, with the assent, or by the permission of the trustee. Bennett settled his accounts with the trustee, and refunded or paid nearly all of the amount he was indebted to his wife. The object of this bill is to attack that settlement, and to reach a part of the funds paid over by Bennett, on the ground that he improperly appropriated in this way, with a view to defraud creditors, portions of the funds belonging to the mercantile firms, and his own private means, with a view thus to secrete property from his creditors.

The allegations of the bill, in this respect, are, that Bennett, before and since the execution of the notes on which the judgments were founded, used the money and effects of the partnership, and his individual money and effects, to purchase real and personal property in Louisiana, in the name of his wife, and for her use ; that the plantation and slaves so purchased, are now held for the use and benefit of said Bennett and his wife. The bill charges that large sums of money accrued to the trustee, under the marriage contract, to be held for the use specified in the deed, but not a sufficient sum to pay for all the property which has been purchased in the name of Mrs. Bennett, and a discovery of the amount and character of the property is prayed for. The bill charges that Gillespie, the trustee, managed the trust fund, and has full knowledge of the whole amount received and invested, and prays a full discovery from him, as to all property or funds received, as well as what has been purchased, and with what funds, as well as the prices paid for each article. The prayer is, that if any of the funds of Shipp, Ferriday & Co., or of H. L. Bennett, have been misapplied, that so much may be decreed to be paid over by the trustee, or that the property thus purchased, be sold, &c.

Bennett, in his answer, insists upon his bankruptcy as a plea in bar. The certificate of discharge bears date in February, 1843. He also denies that, for the purpose of hindering and delaying his creditors, or for any other purpose, he in any way used the funds or property of the partnership, or his individual funds, as charged in the bill; and that all property purchased for his wife, or held by the trustee for her use, was procured

with the separate funds of the wife, derived from her father, or from his estate. The answer proceeds to state the specific sums and property received at the time of the marriage and afterwards, and to specify the property purchased for and owned by Mrs. Bennett. It refers to an account, as stated with the trustee in March, 1839, made an exhibit, as containing the true amounts of receipts and expenditures of the trust fund, by which it seems that H. L. Bennett was then indebted to the trustee in the sum of $34,939, the greater portion of which was liquidated by the transfer of notes, one of which was afterwards collected by Bennett, and for which he is still indebted to the trust fund in the sum of $3,478. This account is made up of sums received and expended by Bennett, beginning in March, 1834, and ending in March, 1839, with interest charged on the several sums disbursed, and credited on the amounts received, showing the balance, as stated, at $34,939. This balance is carried to the credit side of a new account, made an exhibit, commencing the 18th of March, 1839, in which the notes transferred by Bennett, in payment of the amount due his wife, are charged to her. There is also another exhibit, containing a statement of the property of all descriptions belonging to Mrs. Bennett; and, by a farther exhibit, the amount of her liabilities, contracted in the purchase of property, is shown.

The joint answer of Gillespie and Mrs. Bennett contains a positive denial of the allegations of the bill made in reference to Bennett's design to defraud creditors. It also denies the appropriation of the funds of either of the firms, or of Bennett's individual funds, to the purchase of property in the name of Mrs. Bennett, and avers that all purchases were made with the trust fund, and with none other. It is further stated that Gillespie, the trustee, permitted the funds of Mrs. Bennett to go into the hands of her husband, who invested or paid on the contracts of Gillespie, and the account rendered by Bennett in March, 1839, is referred to as showing the amounts received and disbursed, and the balance due; which balance, it is admitted, was settled, as stated by Bennett, by the transfer of notes shortly after the account was stated. In this answer it is also stated, that Mrs. B.'s property in Louisiana consists of a plan-

tation and about eighty-five slaves, purchased by Gillespie in 1842 with the notes transferred by Bennett. She owns, however, but half of this property. The several exhibits to Bennett's answer are referred to, as showing all the facts in relation to which discovery was sought.

Thus it is seen, that the only allegation in the bill on which any relief could possibly be predicated, is denied by all the answers, and the discovery sought operates against the complainant; he cannot, therefore, be entitled to relief, unless his case can be sustained on the proof by the witnesses. There can be no ground for relief, unless it be shown by the proof that Bennett, with a view to defraud his creditors, employed the funds of the firms, or his individual funds, in the purchase of property for, or in securing a benefit to, his wife's separate use. Before we proceed to inquire whether this fact is established, the question of bankruptcy demands a passing notice. This is set up and insisted on as a bar, in reply to which it is said a lien was acquired by the judgments, which is protected by the bankrupt law. It is true that liens on property are not removed by the bankruptcy of the party; but was there any thing in this instance on which the judgment could operate? The chief part of Mrs. Bennett's separate property lies in Louisiana; the judgment in this State was no lien on that. The real estate owned by her, adjoining the city of Natchez, was purchased by Gillespie with money received by him from the estate of her father, and with money borrowed by him. Of course there is no lien on that. It seems that she owns but little else, and indeed is not shown to hold any property on which the judgments could operate as a lien. The question of lien is narrowed down to a mere equity, if it exist at all. Although judgments cannot operate as liens on mere equities, yet courts of equity will regard and treat them as liens on mere equities, and enforce them accordingly by placing the judgment creditor in the place of the judgment debtor. The question, then, is, Is there any equity existing as between Bennett and his wife, or her trustee, which could be enforced by him? None such has been shown, and the complainant at last must rely on his ability to show that means have been fraudulently employed by Bennett for

the benefit of his wife. And the propriety of going into such an investigation, after a party has obtained his discharge in bankruptcy, may be questionable. The bankrupt court would seem to be the place in which such an investigation should take place. But on this point we give no opinion, preferring to place our decision on the merits of the case, as made out by the proof; and we therefore proceed to inquire whether Bennett committed a fraud on his creditors.

The complainant examined but three witnesses, and the defendants did not introduce any proof. Gillespie was the principal witness; and, without noticing his testimony in detail, it will be sufficient to say, that he not only fails to prove fraud on the part of Bennett, but absolutely disproves it, by testifying to the entire correctness of Bennett's accounts. On his testimony but one question can be raised, that is, Was Bennett authorized or justifiable in allowing interest on the funds of his wife which came to his hands? It is conceded that Bennett had a right to give a preference to his wife, amongst his several creditors; but it is contended that he should not have allowed her interest, and by doing so evinced a determination to defraud his other creditors. It seems that Gillespie, the trustee, permitted the trust funds to go into the hands of Bennett, who used them for his own purposes, or invested portions of them as directed, but without any express stipulation or contract in regard to interest. By the marriage contract it was provided, that the trustees should hold the property, real and personal, to and for the use of Bennett and his wife; and it also provided, that the trustees, with the consent of the *cestuis que trust*, might loan the trust fund to Bennett, either at interest or without it, as the *cestuis que trust* might deem expedient.

Upon this provision, we regard the settled rule to be this: wherever the wife has a separate estate, which she permits her husband to use, and there be no stipulation that interest shall be paid by him for the use of it, the law will presume, in the absence of any circumstances showing a contrary intention or understanding, that the husband should not account for or pay interest on the funds. But if, from the mode of dealing, there be any circumstances, from which it may reasonably be inferred

that the intention of the parties was to charge interest, then the husband is rightfully and properly chargeable therewith. Clancy on Husband and Wife, 352. *Powell* v. *Hankey*, 2 P. Wms. 82. Gillespie, in his deposition, says, that "the funds which came under his control as trustee, were placed in the hands of Henry L. Bennett, as his agent, for investment;" and that "there was no express agreement with Mrs. Bennett that her husband should have the funds at interest; but they were placed in his hands, as agent of the trustee, to be by him loaned out at interest and accounted for to the trustee; and he was to make the best investment he could for the benefit of his wife." This statement of Gillespie we think clearly and conclusively shows that Bennett was properly chargeable with interest. He received the money, as the agent of the trustee, to invest on the best terms he could; and, as he used the funds himself, or rather lent them to the mercantile firm of which he was a member, we think he was properly accountable for the highest rate of interest at which the money could have been invested. Gillespie proves that money could have been readily lent at ten per cent. per annum, and says he would not have been satisfied to take less. We think, therefore, that he had a right to receive that rate of Bennett, and that the payment of it to him is no evidence of fraud, and was not fraudulent as to his creditors. It appears, too, from the account in favor of complainant, that, on settlement of his accounts with Bennett, he was allowed and received interest at the same rate; and we cannot think, upon the whole proof in this case, that there is more evidence of fraud in the one case than the other. We are of opinion, that there is no error in the decree of the vice-chancellor, which is, therefore, affirmed. The greater part of this opinion is in the language of Chief Justice Sharkey to whom this case was formerly submitted, and in whose opinion upon it we in the main concur, and whose statement of the principles applicable to it we have, for the most part, adopted. From the fact that our own views coincide with his, we have the more confidence in the correctness of our conclusion.

Decree affirmed.